372 P.2d 692

Patricia M. GOREN, Cochise County School Superintendent, Appellant,

v.

**BUENA HIGH SCHOOL DISTRICT OF COCHISE COUNTY, Arizona, Appellee.**

No. 6761.

Supreme Court of Arizona,

En Banc.

June 29, 1962.

Robert Morrison, Former Atty. Gen., Phoenix, Robert W. Pickrell, Atty. Gen., Phoenix, Lloyd C. Helm, Cochise County Atty., Bisbee, John G. Pidgeon, Former Cochise County Deputy Atty., Bloomington, Minn., for appellant.

William E. Kimble, Tucson, for J. Boone, intervenor.

Joseph U. Cracchiolo, Tucson, for appellee.

ROSS F. JONES, Superior Court Judge.

This is an appeal by respondent, Patricia M. Goren, Cochise County School Superintendent, from a peremptory writ of mandamus issued by the trial court in favor of petitioner, Buena High School District.

The proceedings below were not reported, therefore the facts herein (which are not in conflict) are taken from the briefs of the parties. On July 1, 1957, the Tombstone Union High School District was composed of two common (or elementary) school districts, to wit: Tombstone Elementary School District No. 1 and Buena Elementary School District No. 68. On July 18 the Board of Supervisors of Cochise County ordered that the Buena District be excluded from the Union High School District [1] and on August 6 an election was held in which a majority of the voters in the Buena District favored the establishment of a high school.[2] Shortly thereafter a high school site was chosen and on March 14,

1. Pursuant to what was then A.R.S. § 15–501, subd. D. (1956): "The electors of a school district located within a union high school district may petition the county superintendent of schools for exclusion therefrom. If the superintendent finds that the school house of the school district seeking exclusion is, by the usually travelled route, more than twenty-five miles from the high school building, and that, if such school district is excluded, the remaining territory of the high school district will be contiguous, and that the petition for exclusion contains the bona fide signature of the heads of not less than two-thirds of all families within the school district having children eligible for admission to the high school, and in no event less than twenty-five signatures, he shall transmit the petition to the board of supervisors, together with a statement of the essential facts. It shall thereupon be the duty of the board of supervisors to exclude the school district as petitioned. Such exclusion shall not be construed nor operate to relieve the excluded school

district of liability for bonded indebtedness incurred while it was a part of the union high school district."

2. Pursuant to what was then A.R.S. § 15–501, subd. A.: "A school district having an average daily attendance of not less than two hundred pupils, or an assessed valuation of not less than one million five hundred thousand dollars, may by a majority vote of the qualified school electors thereof, establish and maintain a high school." and A.R.S. § 15–502: "A. When a majority of the board of trustees of a common school district, * * * petition to the county school superintendent for establishment of a high school, and [it is] accompanied by a petition for the establishment of a high school, signed by not less than one hundred resident school electors of the district * * *, the superintendent shall call an election within twenty days after receipt of the petition to determine the question.

*     *     *     *     *

1958 a re-exclusion was made by the County Board of Supervisors confirming the previous exclusion order; this was followed by another election on March 31, favoring the establishment of a high school district coterminous with the common school district. A transcript of the boundaries was filed twice with the board of supervisors and the county assessor on or before April 1.

On April 4 a resolution was adopted by the "Board of Education of the Buena High School District"[3] to submit to the electorate a proposed $50,000 bond issue, and on April 10 and thereafter notice was published by the County Board of Supervisors inviting bids for the issue. On April 10 also, a brokerage firm was employed as the district fiscal agent and a law firm employed in connection with the contemplated issue. By a contract dated April 19, an architect was employed to draw plans for the high school and on May 2 the electors approved the $50,000 bond issue, proceeds from which were to be used in constructing, furnishing and equipping the school. On or about May 13 the district advertised for bids for the construction of the high school and on May 19 bids for the purchase of the bonds were opened. The bonds were issued and delivered to the

most favorable bidder on June 4 and the proceeds therefrom deposited by the County Treasurer in the Buena High School Building Fund. Bids for construction of the building were received until June 6 at which time the most favorable bidder was chosen; a contract was entered into with him on July 1, although construction had begun on June 24.

Thereafter the district presented vouchers to the respondent County School Superintendent to have her draw warrants for the payment of fees to the attorneys, fiscal agent, architect, and contractor and for the expenses of publication. The vouchers were returned however with a notation to the effect that the obligations had been incurred before the district had come into existence, and that respondent was in doubt as to the power and authority of the board of education to obligate the district. Respondent then sought a declaratory judgment and the district a writ of mandamus. The trial court disposed of the matter by means of the writ because it was the "speedier" method, and ordered respondent to issue the warrants for payment from the district's special building fund which held the proceeds from the bond issue. The trial court refused to stay the execution of the

"C. The election shall be conducted as nearly as practicable in the manner prescribed for conducting annual school elections of trustees. The ballots shall contain the words 'for high school,' and the voter shall write or print thereafter on the ballot the word 'yes' or the word 'no'. Officers of the election shall report the result to the county superintendent."

3. Respondent questions whether there was in fact a valid Buena High School District at this time.

**352**

peremptory writ and respondent has since appealed.

Respondent assigned five errors contending: 1) that A.R.S. § 15–402 (1956),[4] which provides that a transcript of the boundaries of each school district shall be filed on or before April 1 and become the legal boundaries on July 1 of each year; applies to high as well as to common school districts, 2) that a high school district does not become effective until the boundaries are legally fixed; 3) that the district had no authority to issue bonds or incur indebtedness until the boundaries became legally fixed; 4) that no funds were budgeted for school construction and a school district can incur no indebtedness and make no expenditures except in accordance with a budget; and 5) that even if the proceeds were validly in the building fund, some of the expenditures were nevertheless invalid because not expended for constructing, furnishing or acquiring a high school building.

■ Respondent's contention that § 15–402 is applicable to high school districts

formed under §§ 15–501, subd. A and 15–502, as well as to common school districts, is correct. In Boyd v. Bell, 68 Ariz. 166, 178, 203 P.2d 618, 626 (1949), we said:

"Section 54–403[5] provides: 'The county school superintendent shall, on the first day of July of each year, file with the board of supervisors a transcript of the boundaries of *each* school district within his county, * * *.'

*"It has never been even suggested that this section does not include high school districts as well as common school districts."* (Emphasis added.)

Since the holding of the case was only that the provisions of what is now § 15–402, subds. B and C, dealing with a change in or enlarging of boundaries, applied both to common and high school districts, this language may be considered dictum. However, in view of the fact that the boundary filing and boundary changing provisions were in the same section when enacted[6] and have undergone no substantial change since, we adopt the reasoning of the court in Bell v. Boyd and hold that the provision

4. "A. The county school superintendent shall, on or before April 1 each year, file with the board of supervisors and the county assessor a transcript of the boundaries of each school district within the county. The boundaries shown in the transcript shall become the legal boundaries of the district as of the following July 1.

"B. District boundaries shall not be changed except between January 1 and April 1.

"C. The boundaries of a district shall not be changed except as provided in this title and then only after the trustees of districts affected have had written notice of the proposed change from the county superintendent and have had an opportunity to be heard."

5. Now A.R.S. § 15–402 (1956).

6. Section 29, Ch. 77, L. '12.

for filing a transcript of boundaries of *each* district, as well as the provisions concerning the change of boundaries, was meant to apply to both common and high school districts. Therefore since the transcript in the instant case was filed before April 1, 1958, the boundaries did not become the legal boundaries of the district until July 1, 1958.

As to respondent's second contention, certainly the Buena High School District would have become effective upon compliance with §§ 15–501, subd. A and 15–502 unless § 15–402, subd. A could be read as postponing its effectiveness until July 1. Statutes dealing with the creation or alteration of school districts, however, are not to have requirements read into them which are not plainly expressed therein or necessarily inferred therefrom.[7] There is nothing in § 15–402, subd. A which expressly postpones the effectiveness of a school district until July 1, and no such intention can be inferred therefrom in view of the other sections affected by § 15–402 which do expressly set a date for effectiveness. Section 15–403, subd. E provides that a change of boundaries "shall become effective from and after the first day of January next following the election."; section 15–403.01 provides that a subdivision annexed by a city shall "[o]n and after July 1 following, * * * be a part of the city or incorporated town district."; section 15–406 provides that a school district may annex itself to another district and "[o]n and after the following July 1, the district shall be a part of the district to which it petitioned to be annexed." These sections would be unnecessary if § 15–402, subd. A was meant to set the date for the effectiveness of the district as well as for the legality of the boundaries. Our interpretation does not defeat the purpose of § 15–402, subd. A, it merely limits the scope of the statute to providing a date upon which all the persons within the district's boundaries must be determined for such purposes as taxation.[8] We hold therefore that the high school district became effective on August 6, 1957, or at the latest on March 31, 1958, upon compliance with §§ 15–501 subd. A and 15–502.

7. See Smith v. Board of Education, 97 Ohio App. 507, 127 N.E.2d 623, app. dismsd. 162 Ohio St. 144, 121 N.E.2d 10 (1954).

8. Under such provisions as § 15–505 which provides: "In the district or union high school district which determines to establish a high school, an annual tax shall be levied, the amount of which shall be estimated by the high school board of education of the district and certified to the county school superintendent on or before July 1. The proper authority, after deducting the amount allowed from state and county funds, shall levy a rate upon the property of the high school district or union high school district which will produce the remaining amount so estimated."

**354**

■ Respondent argues that the provision in A.R.S. § 15–1301 that a bond issue shall not exceed "four per cent of the value of the taxable property within the school district as ascertained by the last assessment of state and county taxes previous to issuing the bonds * * *," indicates that no bonds can be issued until the boundaries become legally fixed because the boundaries must be known to determine the value of the taxable property and the property must be known to fix the limit of the issue. However valid this argument may be where the boundaries defining the limits of the new district are themselves new, it has no application where, as here, the boundaries of the high school district are coterminous with those of the common school district. In such a case the debt limit, based upon the valuation of the property within the boundaries of the high school district, would be the same as it was in the common school district; therefore bonds could be issued before the boundaries became fixed July 1, 1958.

■ Respondent's next contention is that the expenditures made herein were invalid because not itemized by the district and

included in its budget. A.R.S. § 15–1201 sets out the form and contents of the school district budget, providing for the inclusion of: expenses of administration, instructors, operation and maintenance of the plant, etc.; allotments for capital outlay for furniture, equipment, improvements, etc.; special levies including those for improvement of adjacent public ways, a special district levy for building fund, and a special levy for a county school reserve fund; and the bond service for payment of interest on, and the redemption of the outstanding bonds. Section 15–1202 sets out the budgeting procedures to be followed, and subsection F [9] thereof provides that no debt, obligation, or liability shall be incurred "for any purpose *itemized in the budget* in excess of the amount specified for such item". (Emphasis added.) The budget as set out in § 15–1201 makes no provision for obligations incurred through the issuance of bonds for the construction of a new school building by a district newly organized under §§ 15–501, subd. A and 15–502. We hold therefore that the bonds issued in the instant case, pursuant to A.R.S. Title 35, Chapter 3, Art. 3 and Title 15, Chapter 13,

9. "No expenditure shall be made for a purpose not particularly itemized and included in the budget, and no expenditures shall be made, and no debt, obligation or liability shall be incurred or created in any year for any purpose itemized in the budget in excess of the amount specified for such item, irrespective of whether the district at any time has received or has on hand funds in excess of those required

to meet the expenditures, debts, obligations and liabilities provided for under such budget, except under the following conditions:

* * * * *

"3. When a new school district is created pursuant to the provisions of §§ 15–404 and 15–408 the trustees shall adopt a budget in the form set forth in § 15–1201 which will provide funds suf-

(1956), were obligations incurred for a purpose not itemized in § 15–1201 and thus valid though not budgeted.

As to the expenditures from the proceeds of the bonds § 15–1202, subd. F provides that "[n]o expenditure shall be made for a purpose not particularly itemized and included in the budget,". This cannot be read as being exclusive, however, because if it were, there could be no construction of new buildings from bond proceeds since § 15–1201 makes no provision for inclusion of such in the budget. The proper interpretation based on a reading of all of A.R.S. Title 15, Ch. 12 is that the only money received by the district that is to be budgeted is money "from the county school fund and the special county school reserve fund, together with any other anticipated revenue of the district",[10] and not the proceeds from the sale of bonds. On the other hand "[t]he proceeds of the sale of the bonds shall be deposited in the county treasury to the credit of the *building fund of the school district.* Such deposits may be drawn out for the purposes authorized by this article [which include the construction of a school house] as other monies are drawn [by means of warrants]." [11] In view of these sections, we hold that §§ 15–1201 and 15–1202 do not apply to the situation before us; so the expenditures

from the bond proceeds were valid though not budgeted.

■ That brings us to respondent's final contention that all but the payments to the contractor were invalid expenditures because the building fund was created only to construct, furnish and equip a high school. It is obvious that the cost of the architect and the cost of publishing the notice of call for bids for construction of the school were as much a part of the construction costs as were the sums owed the contractor, the payment of which respondent does not question.

As to the expenses of the bond issue, A.R.S. § 35–461 (1956) provides:

"The expenses of the proceedings provided for in this article [Title 35, Ch. 3, Art. 3 providing for the issuance of bonds by municipal corporations including school districts] shall be borne by the political subdivision instituting the proceedings. If the bonds authorized by this article are sold, the expenses thereof shall be deducted from the proceeds of the sale."

In Maxey v. Board of Supervisors of Yuma County, 19 Ariz. 488, 172 P. 285 (1918) we held that the cost of advertising the sale of county road bonds was a proper expense of the proceedings to be charged against

---

ficient for operation of the district during its first year, but thereafter such district shall be subject to the provisions of this article."

10. A.R.S. § 15–1233.

11. A.R.S. § 15–1322, subd. B. Emphasis added.

the proceeds of the bonds but that payments made to a broker for selling the bonds could not be deducted because not within the contemplation of the enactment. The Maxey case however, states no reason, and we have been able to find none, for holding that a statute which specifically allows the payment of the expenses of a bond sale from the proceeds thereof, does not also allow payment of the fiscal agent handling such sale.

Insofar as the language of that case would appear to hold that brokerage fees for handling the sale of bonds for a political subdivision are not proper expenses to be reimbursed from the proceeds of the sale, it is specifically overruled. It appears to us that the fees of the brokers and attorneys as well as the costs of publication were incurred in connection with the bond issue and were thus payable from the special building fund containing the proceeds of the issue.

For the aforesaid reasons the judgment of the trial court is affirmed.

BERNSTEIN, C. J., UDALL, V. C. J., and STRUCKMEYER and LOCKWOOD, JJ., concurring.

NOTE: Justice RENZ L. JENNINGS having disqualified himself, the Honorable ROSS F. JONES, Judge of the Superior Court of Maricopa County, was called in to sit in his stead and participate in the determination of this appeal.